## In re CIVIC CENTER REALTY CO.

District Court, D. Maryland. May 2, 1928.

### No. 5223.

1. Bankruptcy ⬉211—Bankruptcy court may determine whether it or state court will administer bankrupt's incumbered property.

Where no action has been begun for foreclosure in state court previous to bankruptcy, federal jurisdiction is plenary, and bankruptcy court determines whether it should assume jurisdiction to administer the incumbered property, or renounce it.

2. Bankruptcy ⬉262(3)—Bankruptcy court should sell incumbered property free of liens, where there will be remaining equity.

Bankruptcy court is not required to administer property burdened with liens where probable selling price will not be sufficient to satisfy the liens, but should order sale free of liens where there is a reasonable justification for the opinion that there will be an equity which will add to the assets of the estate.

3. Bankruptcy ⬉211—Determination whether bankruptcy or state court should administer incumbered property depends on present market value.

The controlling question, in determining whether bankruptcy court should administer incumbered property of bankrupt, is not what the property is worth, but what it may reasonably be expected to bring at the present market, if sold under foreclosure in state court, or if sold under jurisdiction of bankruptcy court.

4. Bankruptcy ⬉213—Possibility of realizing some equity from private sale of incumbered office building, which would be impossible under forced sale, authorized administration in bankruptcy.

Where 18-story office building of bankrupt was subject to mortgages, value of which would probably exceed price which property would bring at forced sale, due to heavy operating expenses, depression in market for office buildings, and vacancy of three-quarters of space, but true value might be realized at private sale, affording some equity for the estate, bankruptcy court had discretion to assume jurisdiction, and trustees were allowed 90 days within which to dispose of property at private sale, as against second mortgagee's petition to foreclose in state court.

**5. Landlord and tenant ⬤➡101½—Bankruptcy of lessor of incumbered office building released lessee under executory lease, notwithstanding assent of second mortgagee to priority of lease and improvements, where performance of lessor's covenants depended on receiving rents.**

Bankruptcy of lessor, owning 18-story office building heavily incumbered, *held* to release lessee under executory lease of part of premises, in view of possible inability of trustees to perform lessor's covenants requiring heat, light, and janitor service, where failure of lessor to perform depended on performance of lessee, notwithstanding fact that second mortgagee assented to priority of lease and expenses of improvement incidental thereto.

In Bankruptcy. In the matter of the Civic Center Realty Company, bankrupt. Petitions by the Hugo Hoffman Corporation for permission to foreclose a mortgage in the state court, and by the Mutual Life Insurance Company of New York for cancellation of a lease from bankrupt, both opposed by the trustees in bankruptcy. Petition of mortgagee dismissed without prejudice to subsequent renewal, and petition of lessee granted.

James Morfit Mullen, of Baltimore, Md., for trustees.

Frederick J. Singley, of Baltimore, Md., for Hugo Hoffman Corporation.

Barton, Wilmer, Ambler & Barton, of Baltimore, Md., for Mutual Life Ins. Co. of N. Y.

COLEMAN, District Judge. There are involved in this case two questions: (1) Whether a second mortgagee should be permitted to foreclose in the state court, pursuant to the terms of its mortgage, which is in default, or whether the bankruptcy court should assume jurisdiction of the property, for ultimate sale by the trustees in bankruptcy; and (2) whether a lessee under an executory lease of office space in the building so mortgaged may have the lease and its obligations thereunder canceled by reason of the lessor's bankruptcy.

On February, 24, 1928, the Civic Center Realty Company, a Maryland corporation, owner of the Court Square Building in Baltimore (virtually its sole asset), consented to adjudication as an involuntary bankrupt. At this time the premises were subject to a first mortgage of $700,000, held by the Metropolitan Life Insurance Company of New York; a second mortgage of $338,000, held by the Hugo Hoffman Corporation of New York; secured claims amounting to $69,519.67, including taxes; and $46,755.02 unsecured claims—a grand total of $1,154,274.69. The second mortgage being in default, a petition

was filed on March 1, 1928, by the Hugo Hoffman Corporation, alleging that the value of the lot and building was insufficient to pay both mortgages, and asking leave to foreclose. The trustees in bankruptcy have answered, with various allegations and affidavits as to the value of the premises in resisting the foreclosure.

It further appears that on February 7, 1928, the Civic Center Realty Company entered into a lease with the Mutual Life Insurance Company of New York for a period of five years, at an annual rental of $11,000, for the seventeenth and part of the eighteenth floor of the building, by the terms of which the lessor was required to effect certain alterations in the specified office space at a cost of some $5,000, and to assume the unfinished portion of the lessee's existing lease with the Union Trust Company. The new lease was not to be effective till April 1st, or as soon thereafter as the alterations could be completed. On February 24th, as above mentioned, and before any steps had been taken under the lease by either party, the bankruptcy occurred. A petition was thereupon filed by the lessee, asking to be released from its obligations to the bankrupt by reason of the changed situation. Upon the answer to this petition by the trustees, setting forth their prospects of due accomplishment of the conditions provided for in the lease, arises the second question to be decided.

[1, 2] Taking up the first question, since no action was begun for foreclosure in the state court previous to bankruptcy, the federal jurisdiction is plenary, and it is for the bankruptcy court to decide whether it should renounce or assert its jurisdiction. In re Hurlock (D. C.) 23 F.(2d) 500; Matter of United Realty & Home Builders Corporation, No. 4984, Bankruptcy, this court (unreported); Union Electric Co. v. Hubbard (C. C. A.) 242 F. 248. A bankruptcy court is not required to administer property burdened with liens, and should only do so when this is for the interest of the general estate. See In re North Star Ice & Coal Co. (D. C.) 252 F. 301, 304, and cases therein cited. Therefore a sale should not be ordered under the Bankruptcy Act, where the probable selling price would not be sufficient to satisfy the liens, because the court will not assume jurisdiction over what it can never administer. On the other hand, if there is reasonable justification for the opinion that there will be an equity which will add to the assets of the estate, the court may, and should, order such sale free of liens. See In re National Grain Corporation (C. C. A.) 9 F.(2d) 802.

The above being the correct rule of law, it becomes necessary to determine just what the evidence in the present case discloses with respect to the value of the property, in relation to the aggregate of the liens. The total amount of the two mortgages is, as already stated, $1,038,000. On the first mortgage there is interest due of $28,163. The interest on the second mortgage is $7,000; there are state and city taxes in the same amount, and expenses incidental to sale, aggregating $6,640. This latter figure may be assumed from the testimony to be approximately the same, whether we speak of foreclosure proceedings in the state court or sale under order of this court. The total, therefore, of all liens, is $1,086,803. In this figure is included approximately $80,000 alleged by the trustees to represent usurious payments, raising a collateral question which will be hereafter discussed.

Elaborate testimony was introduced respecting the value of the land and the building, both on behalf of the second mortgagee and the trustees. Summarized, the former's valuation is $175,000 for the land and $725,000 for the building, or a total of $900,000. If, therefore, the property brought no more than this latter figure, the total amount of the liens would exceed it by $186,803.

The appraisers appointed by the court to value the property have presented the following figures, which represent the average of their individual valuations: $296,000 for the land, and $959,586 for the building, or a total of $1,255,586, which represents, therefore, an excess of $168,783 over and above the total amount of the liens; that is to say, an excess not greatly different in amount from the deficit resulting from the figures adopted by the second mortgagee.

The building, which was completed a year ago, cost $919,968.03, or approximately 60 cents per cubic foot. The second mortgagee, in placing a present valuation of $725,000 upon it, has apparently assumed that it could be built for about 50 cents per cubic foot, whereas the appraisers for the trustees have adopted a figure of 60 cents. We are not now concerned with replacement value, although it may be noted parenthetically that such evidence as there is in the case bearing upon the present cost of such a structure would seem to indicate an increase, rather than a decrease. The present assessment for tax purposes, state and city, on the land and improvements combined, is $827,300. The method adopted in reaching this figure is not clear from the evidence.

Obviously the variations in the valuation figures presented by the opposing sides are so great that either the figures must be capable of some correction, or they reflect what is usual in cases of this kind, namely, that one man's opinion is bound to vary greatly from that of another in arriving at a conclusion as to what real estate and improvements are worth, when there are a great many factors to be taken into account in making the appraisal, and especially when there have been no recent sales of similar property to minimize the element of speculation. The court believes, however, that the trustees' figures are properly capable of a reduction of $61,000 in the value of the land, because there is no evidence which tends reasonably to support the contention that the land would bring, under any form of sale, at the present time, much more than $200,000.

Its actual purchase price is shrouded in some doubt because, when acquired in 1925, there was no, or virtually no, money consideration; the property being traded for other property the exact then value of which is not entirely clear on the record. There being no dispute that at the present time there is a well-recognized depression in real estate values in this section of Baltimore for this type of building, due to an excess of office building space and other factors, it is not reasonable to place upon the land any greater value than it had in 1925, which may reasonably be taken, in the absence of more exact figures, as the mean between the figure of the second mortgagee and that of the trustees, or $235,000. The foregoing reduction, therefore, in the trustees' figures, would reduce their estimated equity, over and above all liens, from $168,783 to $107,783.

[3] We have thus seen the opposing views as to what the property, land and improvements, are actually worth. But the controlling question now before the court is, not what it is worth, but what it may reasonably be expected to bring at the present market (1) if sold under foreclosure proceedings in the state court; and (2) if sold under the jurisdiction of this court. On this point we enter the realm of speculation to a much greater extent. The second mortgagee's estimate of what it would bring under the most favorable conditions surrounding either type of sale is $900,000; that is, the figure which he estimates as the fair market value of the property. The appraisers for the trustees raise this figure to $950,000. The result of these two estimates, therefore, is this: That not only would the proceeds of the sale fail to cover all of the outstanding liens, but would exceed the amount of the first mortgage

by only $200,000 in one case, and $250,000 in the second, leaving the second mortgage unsatisfied to the extent of $138,000 and $88,000, respectively.

From the foregoing, is it proper to say, without further inquiry, that the case is clearly one where a court of bankruptcy should not intervene, but should permit the second mortgagee to foreclose? To answer this question in the affirmative is tantamount to concluding that there cannot be, under any form of sale, within the near future, a sum realized which will result in any equity whatsoever, over and above liens; that is, no surplus under any possibility to be added to the assets of the estate for the benefit of general creditors. But to adopt such a conclusion seems to the court to ignore certain other factors, which should not be ignored in any attempt to dispose of property of this kind. Foremost among these is the character of the building itself, and its history since completion. It is admittedly a well-built structure, 18 stories high, especially designed and erected as an office building for tenants of the better class. The first floor is peculiarly appropriate for banking purposes, and the central location of the building, at Calvert and Lexington streets, in the very heart of the business section, should make it particularly desirable to lawyers and brokers. On the other hand, although it has been completed for approximately a year, at the present time not more than 25 per cent. of it has been rented, and it is generally admitted that it will require from one to three years to lease the building to 90 per cent. of its capacity—the estimated usual maximum in such cases.

The operating cost per month on the present basis of occupancy is not less than $2,000, to which must be added a monthly fixed charge of approximately $7,000 for taxes and interest. In other words, whoever buys the property must be prepared to assume these expenses, and unless the present rentals of $4,000 per month can be quickly and materially increased, there will be an operating deficit of about $60,000 a year. It appears to have been generally conceded by both sides that the bankrupt corporation showed bad judgment in erecting the building before a permanent tenant had been secured for the ground floor, thus departing from the generally established plan in connection with such structures; that is to say, it is customary either for the owner of the building to occupy such space, or to secure in advance a responsible tenant for the same, such as a bank, which would be both a direct and an indirect source of assured income.

[4] With the above conditions facing any prospective purchaser, conditions which are actual, not fanciful or speculative, is it reasonable to suppose that there is any market for the property at the present time at public sale? The court thinks that it is not, and that, therefore, the only prospect of securing a purchaser willing to pay even as much as the amount of the mortgage indebtedness lies in resort to a private sale, and then only after the matter has been very carefully negotiated. In short, the case presents a peculiar situation, with elements that are nonexistent in the average real estate transaction; that is, it is admitted that at a forced sale at the present time there will be no equity for general creditors, and the weight of the evidence clearly indicates that the second mortgagee would in all likelihood be compelled to take a considerable loss. Obviously, the second mortgagee, if allowed to foreclose, would not be concerned in obtaining more than would insure him against any loss on his investment, whereas, the trustees, representing general creditors, are obligated to look beyond the mere satisfaction of the lien creditors, and to exert every reasonable businesslike effort adapted to the given circumstances to obtain the highest possible price. The exercise of such effort is inconsistent with a public sale, where property of this special character is to be disposed of, especially during a period of depression, or what is commonly known as a "seller's market."

Although the evidence shows that there had been at least one attractive offer prior to bankruptcy which may be revived, such is not likely to occur immediately. On the other hand, under all of the circumstances, it is fair to assume that, if a reasonable length of time is accorded to the trustees in which they may actively negotiate for the disposition of the property at private sale, its true value may thereby be realized, and that true value may yield some equity, even though slight, over and above all valid liens. The court, therefore, concludes that the sounder method to adopt, and one which is entirely consistent with the exercise of the discretionary power granted to it in such cases, is to assume jurisdiction. As the Circuit Court of Appeals for this circuit has said in Allebach v. Thomas, 16 F.(2d) 853, 855: ·

"Just to whom shall be delegated the power to sell the property depends upon many considerations. Preferentially, as between the bankrupt's trustee and the trustees in the deeds of trust executed by the debtor in advance of the bankruptcy, where an equity is believed to exist, the choice would be with the bankrupt's trustee, as he is assumed to be

impartial, and representative of the bankrupt, lienors, and creditors alike; whereas, the trustees in deeds of trust are alone interested in the protection of the beneficiaries named in their several liens. *This entire subject, however, is one solely within the discretion of the bankruptcy court, and it may adopt one of several courses in disposing of the property, best suited to the circumstances of the particular situation, and which it is believed will yield for those interested the best results.*" (Italics inserted.)

And in Union Electric Co. v. Hubbard, previously referred to, the Circuit Court of Appeals for this circuit said (page 250):

"*Where, however, there is any surplus, or any reasonable ground for inferring there may be a surplus or equity in the property,* that would inure to the benefit of the general creditors, or there is any division of agreement among the lien creditors entitled as to the method or tribunal of administration, it is usually the course of the bankrupt court, in pursuance of its exclusive jurisdiction, to take charge of the liquidation and administration of the assets, because *it is impossible under such circumstances for the estate to be properly administered in more than one tribunal.*" (Italics inserted.)

However, the limitation must be imposed that the trustees shall be required to exert their best efforts to dispose of the property at private sale within 90 days, and that, if they are unsuccessful, at the expiration of such time the second mortgagee shall be at liberty to renew its petition to be permitted to foreclose. The second mortgagee should not be compelled to forego the liquidation of its preferred investment beyond such additional period. Such may not be adequate to enable the trustees to procure a purchaser. If not, then the preferred position of the second mortgage must be recognized.

In view of the conclusion which the court has reached, a determination of the collateral question involving usury may properly be deferred until such time as it shall actually arise in connection with a sale, when made. [5] This brings us to a consideration of the second question, namely, whether the executory lease to the Mutual Life Insurance Company of New York should be canceled. The question is one of prospective failure of consideration; that is, whether the likelihood of inability by the lessor to perform its part of the conditions in the lease is so strong as to warrant the court in releasing the lessee. The general principle is thus stated in Williston on Contracts, § 880:

"If one party to a contract is insolvent or bankrupt, he probably will not be able to carry it out even if he so desires, unless his contract relates to specific property, and the solvent party has acquired a legal or equitable property right in the subject-matter of the contract which will be valid against seizure by creditors or by a trustee in bankruptcy of the insolvent contractor, or unless the contract requires of the bankrupt only personal services which insolvency will not prevent him from rendering. Accordingly, the rule is general that a contractor need not trust to the credit of a co-contractor whom he finds to be insolvent, even though he has agreed to do so."

In Central Trust Co. v. Chicago Auditorium Association, 240 U. S. 581, 36 S. Ct. 412, 60 L. Ed. 811, L. R. A. 1917B, 580, the Supreme Court held that bankruptcy of a lessee of rights of baggage and livery service for a lessor hotel constituted an immediate anticipatory breach of the contract. While this case goes on the basis of an action for anticipatory breach, the same principles which support that action operate to give the lessee here the right to ask relief from his contract. In other words, if bankruptcy amounts to a breach by the bankrupt party, certainly the other party should be relieved from his obligations, even though he does not ask damages for such breach. The present lease contains covenants by the landlord to run the elevators, furnish heat, light, and janitor service, to make the specified alterations, and to assume the petitioner's unfinished lease with the Union Trust Company. The lease expressly provides that it shall be subject to all present or future mortgages on the property. The lessee knew of the mortgages, but not of the condition of default thereunder.

In view of the bankruptcy, it cannot be said, with any assurance, that the covenants of the lease will be performed. True, the trustees have strenuously urged their ability and their plans to carry out the agreement; but the court cannot be satisfied that this will, or can, in reality be done. The lessee was to have been given occupancy April 1st, a month ago. The intervention of bankruptcy prevented the stipulated repairs. The lease is still entirely executory. The fact that the second mortgagee may have assented to priority of both the lease and the expenses of the improvements incident thereto is not controlling. Such, without more, would not bind the lessee, nor a future purchaser of the property.

The conclusion here reached is further strengthened by a consideration of the cases

wherein it has been held that a vendee is entitled to withdraw from a contract of sale of real estate, in which the vendor's ability to perform depends upon due performance by the vendee. Brown v. Lee (C. C. A.) 192 F. 817; Gray v. Smith (C. C. A.) 83 F. 824. For in the present case the trustees, in order to accomplish their plans and pay for the necessary alterations, appear to depend to a large extent, at least, upon the rents to be received from the lessee. Under all the circumstances, the court feels that it would be unjust to, force the Mutual Life Insurance Company to vacate its present location and abide by a lease which involves so much uncertainty. Reference is made to the figures in the first part of this opinion, which indicate great uncertainty as to when and for what price the property can be sold, and also a large net operating deficit for one or more years, under any disposition of the property that can possibly be effected.

The petition of the Hugo Hoffman Corporation, second mortgagee, is therefore dismissed, without prejudice, however, to its renewal after a period of 90 days, if the trustees have not within that time disposed of the property, and the petition of the Mutual Life Insurance Company of New York is granted.